UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**CASE NO.**

HIDALGO MINING CORP.,

       Plaintiff,

                                    JURY DEMAND

vs.

JPMORGAN CHASE & CO.,

       Defendant.

_____/

## **COMPLAINT**

Plaintiff, Hidalgo Mining Corp. ("Hidalgo"), hereby sues Defendant, JPMorgan Chase & Co. ("JP Morgan").

## **INTRODUCTION**

1. Hidalgo is a mining corporation that obtained certain rights to silver produced at the Dorosa mine in Mexico.

2. JP Morgan entered into a Deferred Prosecution Agreement ("DPA") with the United States Department of Justice relating to wire fraud charges as a result of JP Morgan manipulating the price of silver through spoofing and other activities.

3. Hidalgo brings this action for the damages it sustained as a result of JP Morgan manipulating the price of silver.

## **THE PARTIES**

4. Hidalgo is a Florida corporation with its principal place of business in Palm Beach Gardens, Florida.

1

5. JP Morgan is a multinational investment bank and financial services company with its principal place of business in New York City, New York.

6. JP Morgan may be served through its registered agent, C T CORPORATION SYSTEM, 1200 SOUTH PINE ISLAND ROAD, PLANTATION, FL 33324.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over Defendant because it is foreign corporation authorized to conduct business in Florida, is doing business in Florida and has registered with the Florida Secretary of State. Defendant has sufficient minimum contacts with Florida, or otherwise intentionally avails itself of the Florida consumer market by providing banking and investment services in Florida. This purposeful availment renders the exercise of jurisdiction by this Court over Defendant.

8. Subject matter jurisdiction is proper in this Court under 28 U.S.C. § 1331 because it involves claims that arise under federal law. Additionally, this Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

9. Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because Defendant transacts business and may be found in this District. Venue is also proper here because at all times relevant hereto, Plaintiff Hidalgo's principal place of business is in the Southern District of Florida and the majority of the United States Hidalgo activity complained of herein occurred in the Southern District of Florida.

10. All conditions precedent to this action have occurred, been performed, or have been waived.

## HIDALGO BACKGROUND

11. Hidalgo was formed in 2009 by John W. Boyer ("Boyer") and Joshua McAlees ("McAlees")

12. McAlees is an individual over the age of 18 who resides in Jupiter, Florida.

13. McAlees is a Certified General Contractor who has been licensed in the State of Florida since 2003.

14. McAlees is also a real estate agent who has been licensed in the State of Florida since 2002.

15. Boyer is an individual over the age of 18 who resides in Palm Beach Gardens, Florida.

16. Boyer is a Certified Public Accountant who has been licensed in the State of Florida since 1984.

17. Boyer is also a real estate agent who has been licensed in the State of Florida since 1987

18. McAlees and Boyer jointly own Hidalgo.

19. Hidalgo was formed with the intention of investing in the precious metals business.

## THE DOROSA MINE

20. McAlees and Boyer scouted Mexico for precious metal mines that could serve as potential business opportunities for Hidalgo.

21. McAlees and Boyer developed a business relationship with the owner and operator of a mine named "Dorosa" in the Sultepec mining district outside of Mexico City, Mexico.

22. The Dorosa mine was owned by Comprosuoro SA de CV. ("Comprosuoro").

23. The Dorosa mine operated under the Comprosuoro subsidiary, Compania Minera Dorosa S.A. DE C.V.

24. McAlees and Boyer began discussion with Comprosuoro regarding the Dorosa mine.

25. At the time of the initial discussions, the Dorosa mine was not operational but had significant reserves.

26. In 2009, Dorosa's reserves were estimated to be valued as follows:

   - $11,848,313.43 for gold; and

   - $159,952,231.32 for silver.

27. While the 2009 estimate showed significant reserves, the mining site needed capital improvements to upgrade the facilities to allow for the continued mining the metals.

28. Due to the significant reserves and the price of silver, McAlees and Boyer agreed to target the silver at the Dorosa mine.

29. Hidalgo reached an agreement to provide funding for mining operations to Comprosuoro in exchange for the future production rights to the silver at the Dorosa mine.

30. Hidalgo raised capital to provide the funding of the mining operations at Comprosuoro.

31. Hidalgo, McAlees, and Boyer retained legal counsel to advise them on raising capital for the funding of the mining operations contracts offered to the investors in Hidalgo.

32. After seeking the advice of legal counsel, Hidalgo began raising capital through various investors through certain silver contracts.

33. Hidalgo raised approximately $10.35 million from approximately 85 investors.

34. McAlees and Boyer personally guaranteed some of the silver contracts offered by Hidalgo.

35. Boyer and McAlees had a separate agreement with Dorosa's owner and the individual who oversaw the mining operations, that Hidalgo would also have an ownership interest in Dorosa once the capital investments provided by Hidalgo were completed.

36. Comprosuoro received approximately $6.7 million from Hidalgo to restart the mining operations at the Dorosa mine.

37. In late 2009, Comprosuoro, using the funding provided by Hidalgo, began renovations and improvements at Dorosa in anticipation of ramping up silver production.

38. A comparison of the mine site for January and February of 2010 is as follows:



ENERO 2010                          FEBRERO 2010

39. The improvements continued in 2010 as shown by the photographs from May and June of 2010 below:



MAYO 2010                          JUNIO 2010

40. Photographs from March and April of 2011 are below:



MARZO 2011                    ABRIL 2011

41. After completing the improvements at the mine site using Hidalgo's capital, the Dorosa mine began production in approximately 2012.

42. From 2012 through 2014 the Dorosa mine produced and sold millions of dollars in silver.

43. The price for the silver produced at Dorosa was tied to the market price of silver through the Commodity Exchange, Inc. ("COMEX") market and the London Bullion Market Association market.

### THE SILVER MARKET

44. Silver futures contracts and silver options contracts are traded on COMEX. These contracts, during 2010-2011, were traded in both an "open outcry" setting and on an electronic trading platform.

45. COMEX is a division of the New York Mercantile Exchange ("NYMEX", owned and operated by CME Group of Chicago ("CME")). COMEX is an organized, centralized market that provides a forum for trading silver futures and options contracts.

## JP MORGAN ACQUIRIES THE LARGEST SHORT POSITION IN SILVER

46. In late 2007 and early 2008, the Bear Stearns Companies, Inc. ("Bear Stearns") held the largest short position in both gold and silver on the COMEX.

47. In late 2007 and early 2008, gold hit an all-time price per ounce high and silver hit a 30-year price per ounce high.

48. Between late 2007 and early 2008, it is estimated that Bear Stearns lost nearly $2 billion from its short positions in gold and silver.

49. In early 2008, JP Morgan agreed to buy Bear Stearns at a price of $10 per share.

50. As a result of the purchase of Bear Stearns, JP Morgan became the largest short seller of silver on the COMEX market.

51. Upon information and belief, the short position that JP Morgan inherited from Bear Stearns was not fully backed by physical silver either in existence or available for purchase at the time.

52. Upon information and belief, having to cover a short position the size of the one that JP Morgan inherited from Bear Stearns would have jeopardized JP Morgan's financial status.

## JP MORGAN'S SHORT TERM MANIUPLATION OF THE SILVER MARKET

53. Because JP Morgan had the largest short position in Silver, JP Morgan had the motive to manipulate the price of silver both short term and long term.

54. The short-term manipulation would help drive the price of silver down so that JP Morgan would not be naked on its long term short position.

55. At all times relevant to this Complaint, JP Morgan, together with its subsidiaries and affiliates, was a global banking and financial services company that was headquartered in New York, New York.

56. At all relevant times, JP Morgan was a financial institution.

57. Gold and silver futures contracts were traded on COMEX. COMEX utilized the "Globex" electronic trading system, which allowed market participants to trade futures contracts on those exchanges from anywhere in the world.

58. While Hidalgo invested in the Dorosa mine and from at least March 2008 until August 2016 (the "Precious Metals Relevant Period"), JP Morgan, together with its subsidiaries and its affiliates, ran one of the world's largest precious metals businesses through its Global Commodities Group with precious metals traders that worked in offices in New York, Singapore, and London, England, and that operated as part of a single, cohesive global unit or "desk" (the "Precious Metals Desk").

59. Gregg Smith was employed as an Executive Director and trader on the Precious Metals Desk in New York.

60. Michael Nowak began working at JP Morgan in July 1996. Nowak was employed as a Managing Director and trader on the Precious Metals Desk, and was the head of the desk supervising other traders, for the entirety of the Precious Metals Relevant Period. During the Precious Metals Relevant Period, Nowak worked in New York and London.

61. Jeffrey Ruffo was employed as a salesperson at Bear Stearns from May 2007 until its acquisition by JP Morgan in May 2008. For the remainder of the Precious Metals Relevant Period, Ruffo was employed as an Executive Director and salesperson on the Precious Metals Desk in New York, specializing in hedge fund sales. Ruffo left JP Morgan in August 2017.

62. Christopher Jordan began working at JP Morgan in March 2006. He was employed as a trader on the Precious Metals Desk from the beginning of the Precious Metals Relevant Period until leaving JP Morgan in December 2009. Jordan worked at JP Morgan's offices in New York and was an Executive Director at the time of his departure.

63. John Edmonds began working at JP Morgan in July 2004. He was employed as a clerk and in a back-office operations role supporting JP Morgan's precious metals traders from the beginning of the Precious Metals Relevant Period until May 2009. After that, Edmonds was employed as a trader on the Precious Metals Desk until leaving JP Morgan in August 2017. He was a Vice President at the time of his departure.

64. Christian Trunz was employed as a precious metals trader at Bear Stearns from July 2007 until its acquisition by JP Morgan in May 2008. For the remainder of the Precious Metals Relevant Period, Trunz was employed as a trader on the Precious Metals Desk. Trunz worked at JP Morgan's offices in New York until June 2013. He transferred to JP Morgan's offices in Singapore, and remained there until he transferred to JP Morgan's offices in London in August 2014. Trunz left JP Morgan in August 2019 and was an Executive Director at the time of his departure.

65. Trader 1 was employed as a precious metals trader at Bear Stearns from May 2007 until its acquisition by JP Morgan in May 2008. Trader 1 was employed as a Managing Director and trader on the Precious Metals Desk in New York until he left JP Morgan in July 2014.

66. Trader 2 joined JP Morgan in 2003. He was employed as a trader on the Precious Metals Desk in London as an Executive Director at the beginning of the Precious Metals Relevant Period. Trader 2 became a Managing Director in May 2014 and ultimately supervised the precious metals traders in London until he left JP Morgan in July 2017.

67. Trader 3 joined JP Morgan in July 2005. He was employed as a trader on the Precious Metals Desk as an Associate from the beginning of the Precious Metals Relevant Period until February 2010, when he was promoted to Vice President. Trader 3 became an Executive Director in November 2014 and remained in that position through the end of the Precious Metals Relevant Period. During the Precious Metals Relevant Period, he worked in New York and London. Trader 3 left JP Morgan in October 2019 and was a Managing Director and the Global Head of Precious Metals Trading at the time of his departure.

68. Trader 4 joined JP Morgan in 2004. He was employed as a trader on the Precious Metals Desk in London as an Associate at the beginning of the Precious Metals Relevant Period. Trader 4 became a Vice President in 2010 and an Executive Director in February 2014.   Trader 4 was terminated from JP Morgan in June 2014 in connection with an inquiry into his trading activity.

69. JP Morgan also employed other supervisors, salespeople, and traders on the Precious Metals Desk in New York, London, and Singapore.

70. During the Precious Metals Relevant Period, Smith, Nowak, Jordan, Trunz, Edmonds, Traders 1 through 4, and one or more other traders on the Precious Metals Desk (collectively, the "Subject PM Traders") and Ruffo and one or more other salespeople on the Precious Metals Desk (together with the Subject PM Traders, the "Subject PM Desk Members") engaged in a scheme to defraud in connection with the purchase and sale of precious metals futures contracts on and subject to the rules of a registered entity, specifically NYMEX and COMEX

71. In furtherance of the scheme, the Subject PM Traders knowingly and intentionally placed orders to buy and sell precious metals futures contracts with the intent to cancel those orders before execution ("Deceptive PM Orders"), including in an attempt to profit by deceiving other market participants through false and fraudulent pretenses and representations concerning the existence of genuine supply and demand for precious metals futures contracts.

72. In tens of thousands of trading sequences, the Subject PM Traders placed one or more orders for precious metals futures contracts that they intended to execute ("Genuine PM Orders"). Sometimes, but not always, the Genuine PM Orders were iceberg orders, so that other market participants could see only a portion of the order's full size at any given time. An "iceberg" order was a type of order that a trader could place on COMEX and NYMEX that did not display the order's full size to other market participants.  Only a pre-set portion of an iceberg order was visible

at any given time. When the visible portion was filled, the next pre-set portion of the order became visible, and so forth.

73. During the same trading sequences, the Subject PM Traders also placed one or more Deceptive PM Orders on the opposite side of the market from the Genuine PM Orders. The Deceptive PM Orders were not iceberg orders, and so the full order size was visible to other market participants.

74. For the most part, the Subject PM Traders placed Deceptive PM Orders electronically using Globex. At times, however, certain of Subject PM Traders (and, in particular, Jordan) placed Deceptive PM Orders through telephone calls to floor brokers in trading pits.

75. Even prior to May 2008, certain precious metals traders at JP Morgan, including Jordan, were trading in this unlawful manner, typically using a single, large Deceptive PM Order that was many times bigger than the visible portion of the opposite-side Genuine PM Order.

76. But when JP Morgan acquired Bear Stearns in May 2008, Smith and Trunz brought to JP Morgan a new style of unlawful trading which involved layering multiple Deceptive PM Orders at different prices in rapid succession that in the aggregate, if not individually, were substantially larger than the visible portion of the opposite-side Genuine PM Order. This new style of "layering," which was more difficult both to execute and to detect than placing a single, large Deceptive PM Order, took hold on the Precious Metals Desk and was adopted by, among others, Nowak, Edmonds, Trader 2, Trader 3, and Trader 4.

77. By placing Deceptive PM Orders, the Subject PM Traders intended to inject false and misleading information about the genuine supply and demand for precious metals futures contracts into the markets,  and to deceive other participants in those markets into believing something untrue, namely that the visible order book accurately reflected market-based forces of supply and demand.

78. This false and misleading information was intended to, and at times did, trick other market participants, including competitor financial institutions and proprietary traders, into reacting to the apparent change and imbalance in supply and demand by buying and selling precious metals futures contracts at quantities, prices, and times that they otherwise likely would not have traded.

79. By placing Deceptive PM Orders to *buy* precious metals futures contracts, the Subject PM Traders intended to create the false impression in the market of increased demand in an effort to drive *up* the prices of those futures contracts.

80. By placing Deceptive PM Orders to *sell* precious metals futures contracts, the Subject PM Traders intended to create the false impression in the market of increased supply in an effort to drive *down* the prices of those futures contracts.

81. In either situation, the Subject PM Traders placed Deceptive PM Orders with the intent to fraudulently and artificially move the price of a given precious metals futures contract in a manner that would increase the likelihood that one or more of their own opposite-side Genuine PM Orders would be filled by other market participants, allowing the Subject PM Traders to generate trading profits and avoid losses for themselves and other members of the Precious Metals Desk, the Precious Metals Desk itself, and ultimately, JP Morgan and JP Morgan.

82. Once the Subject PM Traders successfully used their Deceptive PM Orders to get their Genuine PM Orders filled (either in whole or in part), they attempted to, and generally did,  quickly cancel their Deceptive PM Orders before they could  be executed.  Sometimes, however, they  were unable to  cancel  quickly  enough, and  had  to accept  unintended (and  unwanted) executions of their Deceptive PM Orders.

83. One of the reasons the Subject PM Traders used Deceptive PM Orders in their trading was to service and benefit key clients, including hedge funds, which were important  sources  of  revenue  and  market  intelligence  for  the  Precious  Metals Desk. For example, if a hedge fund wished to purchase gold, Ruffo would receive the  order  and  communicate  it  to  Smith,  who,  with  Ruffo's  knowledge  and encouragement,  would  then  place  Deceptive  PM  Orders  to  sell  gold  futures contracts in order to artificially lower the price at which the hedge fund could buy (or  one  of  the  Subject  PM  Traders  could  buy  on  the  hedge  fund's  behalf).  By passing along the lower price, the Subject PM Desk Members hoped to retain the hedge fund's business for the Precious Metals Desk.

84. In  total,  during  the  Precious  Metals  Relevant  Period,  the  Subject  PM  Desk Members' fraudulent and manipulative trading activity involving the placement of Deceptive  PM  Orders  resulted  in  at  least  $200,847,102  in  losses  to  other participants in the markets for precious metals futures contracts.

85. The  Deceptive  PM  Orders  placed  by  the  Subject  PM  Traders  were  transmitted electronically via international and interstate wire communications from New York,

London, and Singapore to computer servers operated by the CME Group in and around Chicago and Aurora, Illinois.

86. In executing the scheme to defraud in connection with the purchase and sale of precious metals futures contracts and the placement of Deceptive PM Orders, the Subject PM Desk Members  were acting within the scope of their employment  as employees  of JP Morgan and its affiliates, and as agents of JP Morgan, and with the intent, at least in part, to benefit JP Morgan.

87. At times, the Subject PM Desk Members discussed their unlawful activity with each other using electronic communications such as "chats" and emails. On May 27, 2008, at 9:41:21 a.m.1, Trader 1 informed Nowak that Smith "just bid it up to [. . .] sell." Approximately contemporaneous with Trader 1's comment, Smith was engaged in trading activity that involved placing multiple Deceptive PM Orders to buy (i.e., "bids") on the opposite side of the market from his Genuine PM Orders to sell. For example, at 9:39:56.313 a.m., Smith placed a Genuine PM Order to sell seven silver futures contracts at $17.575. Next, 11.677 seconds later, beginning at 9:40:06.041 a.m., Smith placed 13 layered Deceptive PM Orders to buy seven contracts each (91 contracts total) from $17.555 to $17.565 with the intent to create the illusion of demand, deceive other market participants, and artificially move the market price higher. Beginning at 9:40:08.266 a.m., all seven contracts in Smith's Genuine PM Order were filled. Then, 267 milliseconds after the last contract was filled, beginning at 9:40:09.935 a.m., Smith canceled his Deceptive PM Orders i O

88. February 24, 2009, at 8:39:24 a.m., Trunz alerted a salesperson on the Precious Metals Desk in London via chat to the fact that Smith was placing Deceptive PM Orders:

> Trunz:          so you know its gregg bidding up on the futures trying to get some off
> Salesperson 1:    sweet mate
> Trunz:          incase you were watching some large bids come into market Salesperson 1:appreesh  //  that worked !
> Trunz:          haha

Approximately contemporaneous with this conversation, Smith was engaged in trading activity that involved placing multiple Deceptive PM Orders to buy (*i.e.*, "bidding up"). For example, at 8:35:35.110 a.m., Smith placed a Genuine PM Order to sell seven gold futures contracts at $988.90. Next, 47.195 seconds later, beginning at 8:36:22.305 a.m., Smith placed 11 layered Deceptive PM Orders to buy seven contracts each (77 contracts total) from $988.60 to $988.80 with the intent to create the illusion of demand, deceive other market participants, and artificially move the market price higher. Then, 1.203 seconds later, beginning at 8:36:23.508 a.m., three of the seven contracts in Smith's Genuine PM Order were filled. Last, 957 milliseconds later, beginning at 8:36:24.465 a.m., Smith canceled his Deceptive PM Orders in their entirety.

89. On April 1, 2009, at 2:57:54 p.m., Jordan commented to a precious metals trader at another financial services firm that "every order i do is iceberged it funny actualy i show 1 lot then when i need to get filled i will bid or offer size in front of it then boom." Earlier that same day, Jordan engaged in trading activity using Deceptive

PM Orders in the same manner as he described. Specifically, at 9:29:20.263 a.m., Jordan placed an iceberg Genuine PM Order to buy 17 silver futures contracts at $13.065. Jordan was subsequently able to fill three of those contracts. At 9:29:24.529 a.m., Jordan placed a Deceptive PM Order to sell 278 contracts at $13.070 with the intent to create the illusion of supply, deceive other market participants, and artificially move the market price lower. Next, beginning 18 milliseconds later, the remaining 14 contracts in Jordan's Genuine PM Order to buy were filled. Last, 1.840 seconds after the last contract was filled, Jordan canceled his Deceptive PM Order in its entirety.

90. On September 24, 2009, Trader 1 had the following chat communication with a trader on the Precious Metals Desk in London about deceiving a particular floor trader:

| Trader 1: | I offered a lot of sil switches 100 to 200 a switch. Spoofed locals aftewr number and hopefully mr s h a q |
| Trader 5: | good man |

91. On October 15, 2009, Jordan sent several electronic communications in which he described his unlawful trading activity which occurred that day. At 7:41 a.m., Jordan sent an email to an individual with the subject, "hey buddy," and stated, "hold on to your hat today, I have my lead pipe out in silver. last night has the feel of capitulation in everything but ive been wrong before." As the trading day ensued, Jordan engaged in multiple trading sequences involving Deceptive PM Orders. For example, at 10:32:33.976 a.m., Jordan placed an iceberg Genuine PM Order to buy 14 silver futures contracts at $17.615. Next, 2.248 seconds later, at 10:32:36.224 a.m., Jordan placed a Deceptive PM Order to sell 105

contracts at $17.620 with the intent to create the illusion of supply, deceive other market participants, and artificially move the market price lower. Then, 24 milliseconds later, beginning at 10:32:36.248 a.m., all 14 contracts in Jordan's Genuine PM Order were filled. Next, 772 milliseconds after the last contract was filled, Jordan canceled his Deceptive PM Order in its entirety. Later that afternoon, at 1:13:11 p.m., Jordan wrote to a different individual and commented, "ive taken my leadpipe/ your olsd mini basebsall bat out of my bottom drawer ahah, i am whacking this thing."

92. On January 30, 2012, beginning at 3:35:52 p.m., Nowak recounted to a precious metals trader at a competitor financial institution a conversation that Nowak recently had with another former precious metals trader, saying "he did talk about the silver market // and how he used to spoof it // by showing huge huge bids and cancelling // ie--what's totally not allowed to do these days." After the date of this electronic communication, the Subject PM Traders continued to engage in their unlawful trading activity, including thousands of trading sequences involving Deceptive PM Orders, with hundreds of those trading sequences involving Nowak, himself, placing the Deceptive PM Orders. As one example, on February 6, 2012, at 8:47:41.128 a.m., Nowak placed an iceberg Genuine PM Order to sell five gold futures contracts at $1,717.80. Then, 2.281 seconds later, beginning at 8:47:43.409 a.m., Nowak placed 11 layered Deceptive PM Orders to buy five contracts each (55 contracts total) from $1,716.90 to $1,717.60 with the intent to create the illusion of demand, deceive other market participants, and artificially move the market price higher. Next, 1.940 seconds later, beginning at 8:47:45.349

a.m., all five contracts in Nowak's Genuine PM Order were filled. Last, 866 milliseconds after the last contract was filled, beginning at 8:47:46.223 a.m., Nowak canceled his Deceptive PM Orders in their entirety.

93. As one example of Trader 4's unlawful trading activity, on January 14, 2014, at 10:05:57.063 a.m., Trader 4 placed an iceberg Genuine PM Order to buy 20 silver futures contracts at $20.415. Trader 4 subsequently was able to fill 10 of those 20 contracts. Then, 55.064 seconds later, at 10:06:52.127 a.m., Trader 4 placed a Deceptive PM Order to sell 100 contracts at $20.425 with the intent to create the illusion of supply, deceive other market participants, and artificially move the market price lower. Next, 98 milliseconds later, beginning at 10:06:52.225 a.m., the remaining 10 contracts in Trader 4's Genuine PM Order were filled. Last, 541 milliseconds after the last contract was filled, Trader 4 canceled his Deceptive PM Order in its entirety.

## JP MORGAN'S LONG TERM MANIPULATION OF THE SILVER MARKET

94. The price of silver saw a small rally between February and May of 2011 wherein the price per ounce of silver nearly doubled.

95. In April of 2011, the price per ounce of silver hit a high for 2011.

96. During this time, JP Morgan was the largest short seller of silver on the COMEX.

97. Because of JP Morgan's large short position on silver, the substantial price increase could cause significant financial damage to JP Morgan.

98. Upon information and belief, JP Morgan employed the short term spoofing identified above to keep the short term prices low.

99. By the end of 2011, the price of silver was nearly half the price it was during the high of 2011.

100.    JP Morgan maintained its large short position on silver, which had the potential to cause significant damages to JP Morgan should the silver price rally again in the future.

101.    Upon information and belief, JP Morgan employed a managed and organized way of covering its large short position in silver by buying physical silver.

102.    With a low price of silver, JP Morgan could purchase physical silver to cover its large short position.

103.    After the price of silver rose then fell in 2011, JP Morgan began buying large quantities of physical silver.

104.    Buying the physical silver allowed JP Morgan to gain some protection from its large short position on silver.

105.    From approximately 2011 to the present, JP Morgan stockpiled large quantities of physical silver.

106.    JP Morgan is recognized today as the largest holder of physical silver.

107.    As a result of its large short position, JP Morgan had an interest in keeping the price of silver low.

108.    Using the three-pronged approach of spoofing, shorting, and buying physical silver, JP Morgan was able to manipulate the price of silver and keep it low.

109.    The motive in keeping the price of silver low was to strategically exit the large short position and stockpile the large quantity of physical silver.

21

110.     With the large quantity of physical silver and an exit from the large short position, JP Morgan could potentially profit in the future through an increase in silver prices.  Thus, JP Morgan's actions resulted in turning the large concentrated short position that caused significant damage to Bear Sterns into a potentially profitable position on physical silver held by JP Morgan.

## JP MORGAN ENTERS INTO THE DPA

111.     On September 29, 2020, the United States of America filed an information charging JP Morgan with two counts of wire fraud.

112.     That same day, on September 29, 2020, JP Morgan filed the DPA, which is attached as **Exhibit 1**.

113.     Pursuant to the DPA, JP Morgan agreed not to dispute facts set forth in the Statement of Facts section of the DPA.

114.     Paragraphs 59 through 93 above are facts that were contained within the Statement of Facts.

115.     Prior to the DPA, Hidalgo was unaware of JP Morgan's manipulation of silver prices and the silver market.

116.     JP Morgan's manipulation of the silver market was hidden and concealed from the public and Hidalgo.

117.     JP Morgan's manipulation of the silver market was not disclosed to the public or Hidalgo.

118.     JP Morgan had knowledge of its manipulation and was a willing participant in the manipulation of the silver prices and the silver market.

119.     Upon information and belief, JP Morgan's officers and directors either knew or should have known of both the short term and long term manipulation of the silver prices and silver market.

## DECREASING SILVER PRICES RESULTS IN
## DOROSA PAUSING OPERATIONS

120.     In April of 2011, Silver was trading at approximately $50 per ounce, which was double the amount it was trading six months prior.

121.     In 2013, the price of silver began to dropped over 35%.

122.     In the beginning of 2013, silver was trading at over $30 per ounce but was less than $20 per ounce by the end of 2013.

123.     In 2014, silver had another double-digit price drop.

124.     With the decreasing prices, it became apparent to Comprosuoro and Hidalgo that the cost of producing the silver would greatly exceed the market price. Thus, operating the mine would be at a substantial loss until the price of silver stabilized and returned to its prior price points.

125.     In late 2014, Comprosuoro shut down production at the Dorosa silver mine and suspended all mining development and operations because the market price of silver at the time was less than the cost to produce the silver at the mine.

126.     After the Dorosa stopped production, investors sought payment from Hidalgo, McAlees, and/or Boyer.

127.     To date, McAlees and Boyer have repaid over $1.8 million to individuals who purchased silver contracts from Hidalgo.

128.     Certain Hidalgo investors filed claims against Hidalgo, McAlees, and Boyer.

129.     In addition, the Securities Exchange Commission ("SEC") conducted an investigation of Hidalgo, McAlees, and Boyer.

130.     Hidalgo, McAlees, and Boyer denied the SEC's claims and were able to resolve the dispute with the SEC with the SEC agreeing to close its investigation and dismissed all claims against Boyer and McAlees without finding any liability on behalf of McAlees and Boyer.

131.     Despite the resolution and a finding of no liability from the SEC, Hidalgo, Boyer, and McAlees were significantly damaged by the investigation.

132.     Hidalgo's private investors asserted claims against Hidalgo, McAlees, and Boyer.

133.     The claims by the private investors have damaged Hidalgo, McAlees, and Boyer.

134.     JP Morgan's actions during the relevant time period controlled the entire silver market allowing JP Morgan to drive the market price of silver in JP Morgan's favor.

135.     The sales from the silver at the Dorosa mine were based on and directly tied to the market price of silver.

136.     As a direct, proximate, and foreseeable result of the market price manipulation by JP Morgan, the Dorosa mine was forced to pause its operations causing significant damage to Hidalgo.

137.     As a direct, proximate, and foreseeable result of the market price manipulation by JP Morgan, Hidalgo suffered damages.

138.     Hidalgo has retained the undersigned counsel and agreed to pay a reasonable attorney's fee.

**COUNT I**
**VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962**

139.     Plaintiff re-alleges and incorporates paragraphs 1 through 138 of this Complaint as fully set forth herein.

140.     During the relevant time outlined above and in the DPA, JP Morgan conducted and participated in an illegal enterprise through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.

141.     The RICO enterprise which engaged in and the activities of which affected interstate and foreign commerce, was comprised of an association in fact of entities and individuals that included JP Morgan, its subsidiaries, affiliates, and employees, including those identified herein and in the DPA.

142.     The members of the RICO enterprise had a common purpose: to manipulate the price of silver on the open market.

143.     The members of the RICO enterprise concealed their actions from the public and Hidalgo.

144.     Defendant shared the bounty of the enterprise, for example by profiting off the short term market manipulation, exiting the long term short position, and setting

up exponential profits on the physical silver acquired during the relevant time period.

145.     The RICO enterprise functioned over a period of years as a continuing unit and had a maintained an ascertainable structure separate and distinct from the pattern of racketeering activity.

146.     JP Morgan directed and controlled the enterprise.

147.     The enterprise manipulated the market price on silver for years.

148.     As a direct, proximate, and foreseeable result of the market price manipulation by JP Morgan, Hidalgo suffered damages.

WHEREFORE, Plaintiff seek compensatory and treble damages, attorneys' fees and costs, pursuant to 18 U.S.C. § 1964.

## COUNT II
## VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

149.     Plaintiff re-alleges and incorporates paragraphs 1 through 138 of this Complaint as fully set forth herein.

150.     This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 et seq. (the "Act" or "FDUTPA"). The stated purpose of the Act is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

151.     Plaintiff is an interested party  and/or consumer as defined in  Fla. Stat. § 501.203.

152.     The actions defined in this complaint constitute a trade or commerce as defined by Fla. Stat. § 501.203.

153.     Florida Statute § 501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

154.     JP Morgan's market manipulation was deceptive acts and unfair practices were illegal and unlawful pursuant to FDUTPA.

155.     JP Morgan acted willfully, knowingly, intentionally, unconscionably and with reckless indifference when it committed these acts of market manipulation.

156.     JP Morgan's actions constitute unconscionable commercial practices, in violation of the FDUTPA.

157.     JP Morgan's market manipulation, deceptive acts, and unfair practices manipulated the market price of silver.

158.     The price of silver at the Dorosa mine was determined by the market price.

159.     As a direct and proximate cause of JP Morgan's manipulation of the market price of silver, Hidalgo suffered significant actual damages caused by JP Morgan's actions.

WHEREFORE, Plaintiff seeks actual damages, attorneys' fees and costs.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a jury trial for any and all Counts for which a trial by a jury is permitted by law.

Dated September 28, 2021

Respectfully submitted,

By: /s **J. Chris Bristow**
**J. CHRIS BRISTOW**
Florida Bar No. 068304
**CRITTON, LUTTIER & COLEMAN LLP**
303 Banyan Blvd
Suite 400
West Palm Beach, FL 33401
Telephone: 561-842-2820
Facsimile: 561-253-0164
Attorneys for the Plaintiff
JCBristow@lawclc.com
smcdonald@lawclc.com
malers@lawclc.com